## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LOREN LARUE WALTZ,** | : | **Civil No.  3:24-CV-1020** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **LELAND DUDEK,**[1] | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The plaintiff in this Social Security appeal, Loren Waltz, is a former dairy farmer who became unable to perform his past heavy labor work due to chronic knee and lower extremity pain caused by osteoarthritis, along with other impairments. The administrative law judge (ALJ) considered the effects of these impairments on Waltz's ability to perform work-related activity during a disability period encompassing less than one year, from the date of the alleged onset, August 17,

---

[1]Leland Dudek became the Acting Commissioner of Social Security on February 16, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for the previously named defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2020, through Waltz's date last insured, March 31, 2021. After reviewing the meager record of his impairments during this period, including the longitudinal medical evidence, Waltz's testimony and statements about his abilities, and the medical opinion evidence of both treating and non-treating medical consultants, the ALJ concluded that Waltz was unable to perform his past strenuous work as a dairy farmer, given his orthopedic impairments and obesity, but that he would be capable of performing work that existed in significant numbers in the national economy at the light exertional level with certain postural limitations.

In his concise brief, the plaintiff focuses on a misstatement of the ALJ as to Waltz's age category at his date last insured, arguing this was reversible error. Thus, while the ALJ correctly stated that Waltz was fifty years old on his date last insured, he stated this was defined as a younger individual under the Social Security regulations. In our view, this scrivener's error was harmless since the balance of the decision, as well as the transcript of the hearing, clearly demonstrate that the ALJ considered the claimant's correct age and age category when considering his claim and formulating Waltz's residual functional capacity (RFC). The plaintiff's other brief and cursory arguments regarding the ALJ's consideration of the evidence and medical opinion evidence in this case are also unavailing, given the deferential standard of review that applies when considering Social Security appeals, a standard

of review which simply asks whether there is "substantial evidence" supporting the ALJ's determination.

After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.    Statement of Facts and of the Case

### A. Background

The administrative record of Waltz's disability application reveals the following essential facts: On January 27, 2021, Waltz applied for disability and disability insurance benefits pursuant to Title II of the Social Security Act alleging an onset of disability beginning August 17, 2020. (Tr. 25).  According to Waltz, he was completely disabled due to the combined effects of knee, leg, and ankle problems, including a right knee meniscus tear and degeneration, plantar fasciitis, tarsal tunnel, left foot surgery, right hip pain, Hashimoto's disease, and herpes of the eyes. (Tr. 71). Waltz was born on December 21, 1970, and was forty-nine years old at alleged onset of his disability, which is defined as a younger person under the

Commissioner's regulations. (Tr. 71). During the disability period, Waltz transitioned age categories to a person closely approaching advanced age and was fifty years old on his date last insured, March 31, 2021. (Id.) He has a high school education and previously worked as a dairy farmer. (Tr. 34).

The relevant disability period is brief, spanning just seven months between August 17, 2020, the alleged onset date, and March 31, 2021, the date last insured. The medical evidence during this time demonstrates that Waltz's obesity and orthopedic issues in his lower extremities rendered him unable to perform his past, heavy exertion, work as a dairy farmer, but that his impairments did not have the fully disabling effects he described. During the relevant period, Waltz saw his primary care physician, Dr. Chapla, and an orthopedist for knee pain. Around the alleged onset date, in August 2020, he visited the emergency room for leg pain and osteoarthritis of the right knee was noted. (Tr. 539). He followed up with his orthopedist who noted he had done a significant amount of walking at Niagara Falls the prior weekend and "had to do a run while at his family farm recently as there was a fire." (Tr. 645). An examination revealed tenderness in his right knee joints and over the fibular head but intact quadricep strength, and intact sensory and motor function. (Tr. 645). His orthopedist noted that his pain was likely due to exacerbation of his osteoarthritis due to increased activity, and he received lidocaine injections

and was advised to do stretching exercises and wear supportive shoes. (Tr. 646). He was advised to follow up with podiatry for his left plantar fasciitis discomfort. (Id.) In September 2020 Waltz's wife reported to his orthopedist that he had not been doing his regular duties at work and had not been doing much of anything. (Tr. 658).

The ALJ summarized the meager longitudinal medical evidence with regard to Waltz's orthopedic impairments as follows:

> The claimant is six foot two inches tall and weighs 300 pounds (Hearing Testimony). His body mass index (BMI) would classify him as obese. He has complaints of right knee pain, and the record shows he had surgery to repair a meniscus tear with grade II osteoarthritis of the medial femoral condyle (Exhibit 7F/p. 4). An x-ray in February 2020 showed osteoarthritic changes at the patellofemoral articulation, and joint space narrowing in the medial compartment around 50% (Exhibit 7F/p. 5). Physical exam findings in both knees showed some tenderness along the medial joint line, crepitus at the patellofemoral articulation with active knee flexion and extension, negative for varus and valgus instability, no obvious effusion, he could perform straight leg raise, and he had no motor, sensory or reflex deficits (Exhibit 7F/p. 5). He was provided a medial unloader brace for his right knee, advised of other options for injections, and noted that he should hold out as long as he can for a total knee replacement (Exhibit 7F/p. 26). He noted the brace was helpful, but the Euflexxa injections were not helped (Exhibit 7F/p. 67).
>
> He complained of plantar fasciitis in the left foot and was advised to do some stretching exercises, wearing a night splint, and roll a frozen water bottle, tennis ball, and golf ball under his foot (Exhibit 7F/p. 5). An x-ray of his left foot showed mild osteoarthritis of the distal interphalangeal joints and first metatarsophalangeal joint, a small plantar calcaneal spur and mild pes planus (Exhibit 10F/p. 9). He was advised that while some of his foot fatigue is likely related to the pes

planus deformity and orthotics were suggested. It was noted that he will not know the effectiveness of the tarsal tunnel release he underwent. He was to return in 6-8 weeks for reevaluation (Exhibit 10F/p. 8).

Overall, the longitudinal evidence of record does not support the claimant's allegations concerning the intensity, persistence, and limiting effects of his symptoms. Physically he is obese and has some orthopedic issues with left foot and bilateral knees. Physical exam findings in both knees showed some tenderness along the medial joint line, crepitus at the patellofemoral articulation with active knee flexion and extension, negative for varus and valgus instability, no obvious effusion, he could perform straight leg raise, and he had no motor, sensory or reflex deficits (Exhibit 7F/p. 5).

(Tr. 31-32).

The record also notes several visits with Waltz's primary care physician Dr. Chapla during the relevant period. These were primarily telemedicine visits during which no physical examination was conducted, though notes reflect he regularly denied chronic pain, loss of strength, and limb weakness. (Tr. 487, 489, 491, 494). There is some evidence that Waltz was being treated for Hashimoto's disease/hypothyroidism, although the disabling effects of this impairment are unclear. A thyroid ultrasound on October 1, 2020, revealed an enlarged thyroid gland with heterogenous echotexture of both thyroid lobes which can be seen in settings of goiter or thyroiditis. (Tr. 536). A likely benign nodule on the left node was also noted. (Id.) On October 8, 2020, Waltz's treating physician, Dr. Chapla, noted:

6

> [Patient] has a history of Hashimoto's disease. He stopped taking his
> levothyroxine 2 years ago because he wasn't feeling any better when
> he was taking it. [Patient] says that in the past 2 months he has been
> feeling terrible. He is extremely tired even with extra rest and has had
> a constant hoarse voice and body aches. [Patient] has noticed significant
> weight gain and has actually eaten less. [Patient] has not been working
> for a month.

(Tr. 498). Dr. Chapla discussed the importance of taking his medication regularly,

advised him to follow his diet and exercise and lose weight. (Tr. 499). He was

instructed to start levothyroxine as directed. No other issues are noted in the medical

record with regard to his hypothyroidism or Hashimoto's disease, though it is noted

that he continued with levothyroxine throughout the relevant period. (Tr. 380, 386,

400, 418). A March 2021 note stated he was increasing levothyroxine due to

hyperlipidemia and hypertriglyceridemia probably secondary to hypothyroidism.

(Tr. 487).

Waltz also completed a function report describing the effects of his physical

impairments on his ability to perform work-related activity. He stated that, due to

severe pain in both knees and his left foot, he was unable to work. (Tr. 259). He

stated that he experienced pain associated with standing and relieved pain in his

lower extremities by keeping them elevated. (Tr. 260). Although he noted being

unable to stand for long periods, he stated that he could prepare quick meals, fold

laundry, and load and unload the dishwasher, though he was unable to do yard work.

(Tr. 261). Waltz reported being able to drive and grocery shop, though preferring his wife drive due to pain, and stated that he watches TV and spends a lot of time at home due to pain in his lower extremities. (Tr. 262-63). He reported using crutches, a wheelchair, and a brace/splint. (Tr. 265).

On November 16, 2022, Pivot Physical Therapy completed a "safety assessment" of Waltz's physical abilities with regard to his perform work-related activities. (Tr. 731-42). Waltz reported that his leg pain began in 2007 after playing softball, though he continued to work through the pain as a dairy farmer until August 2020. (Tr. 733). He stated that walking almost any distance was very difficult and that he had purchased a wheelchair to help with his mobility. (Id.) He reported being independent with dressing, hygiene, eating, and cooking, with sitting breaks, and that he could drive up to thirty minutes before needing to stretch. (Tr. 734). He stated he needed support to go up and down stairs and was unable to perform yard work and housework requiring climbing, kneeling, squatting, or standing. (Id.) The physical examination revealed normal posture but an antalgic type gait pattern with poor to no knee flexion at times but no assistive device. (Id.) Waltz exhibited good gross strength throughout his upper quarter but only 4/5 bilateral knee extension and flexion strength. (Id.)

Given this clinical picture, two State agency medical consultants and two examining sources opined on Waltz's ability to perform work-related activities. On June 10, 2022, State agency medical consultant Dr. Manganiello opined that Waltz could perform a range of medium exertional work, (Tr. 76), finding that he could occasionally lift and/or carry up to fifty pounds and frequently lift and/or carry up to twenty-five pounds, could stand and/or walk for a total of about six hours and sit for a total of about six hours in an eight-hour workday. (Tr. 73-74). Dr. Manganiello further opined that Waltz could occasionally climb ramps/stairs, balance, stoop, kneel, and crouch, but could never crawl or climb ladders/ropes/scaffolds. (Tr. 74). On reconsideration, Dr. Angela Walker indicated Waltz could only perform a range of light exertional work, (Tr. 82), finding he was slightly more limited in his ability to lift and/or carry, occasionally being able to lift and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds, but finding similarly to Dr. Manganiello that he could stand and/or walk and sit for a total of about six hours in an eight-hour workday. (Tr. 80). Dr. Walker also found he was restricted to the same postural limitations as Dr. Manganiello. (Tr. 81).

Waltz's treating physician, Dr. Pravin Chapla, also completed a medical source statement of Waltz's ability to perform work-related activities on November 14, 2022. (Tr. 743-748). Dr. Chapla opined that Waltz could occasionally lift up to

9

twenty pounds and could occasionally carry up to ten pounds, but never more. (Tr. 743). According to Dr. Chapla, Waltz would only be able to sit for one hour total and stand and walk for ten minutes total in an eight-hour workday. (Tr. 744). Although his opinion first indicates he does not require a cane to ambulate, it also states that a cane is medically necessary. (Id.) Dr. Chapla further opined that Waltz could occasionally operate foot controls bilaterally, but could never perform basically any postural activities, including climbing stairs, ramps, ladders, or scaffolds, stooping, kneeling, crouching, or crawling, though he opined that Waltz could occasionally balance. (Tr. 746). According to Dr. Chapla, Waltz could never be exposed to unprotected heights, moving mechanical parts, or vibrations and could only occasionally operate a motor vehicle. (Tr. 747).

On November 16, 2022, Pivot Physical Therapy also completed a medical source statement of Waltz's functional ability following his examination. (Tr. 731-742). The statement concluded that Waltz would be limited to performing four hours of sedentary work per day. (Tr. 732). According to the physical therapy statement, Waltz could occasionally stand and walk and constantly sit, though he would need to occasionally recline and elevate his feet, he could frequently reach and occasionally stop, but rarely crouch, could rarely lift twenty-five pounds floor to waist and waist carry and could rarely lift forty pounds wait to shoulder lift. (Id.)

It was against this medical background that Waltz's case came to be considered by the ALJ.

## B. **The ALJ Decision**

A hearing was conducted in Waltz's case on May 2, 2023, at which Waltz and a vocational expert testified. (Tr. 41-69). Following this hearing, on July 6, 2023, the ALJ issued a decision in Waltz's case. (Tr. 22-39). In that decision, the ALJ first concluded that Waltz last met the insured requirements of the Act on March 31, 2021, and did not engage in substantial gainful activity during the period from his alleged onset date of August 17, 2020, through the date last insured. (Tr. 27). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Waltz had the following severe impairments: osteoarthritis of the right knee, osteoarthritis of the left knee (status post-surgery), plantar fasciitis, left tarsal tunnel syndrome (status post-surgery), and obesity. (Tr. 28). The ALJ found that Waltz's diabetes, hyperlipidemia, hypothyroidism, and hypertriglyceridemia were non-severe impairments because they did not cause any significant functional limitations or lasted or were expected to last twelve months or more. (Tr. 28). Nonetheless, the ALJ acknowledged that these non-severe impairments were considered during the RFC formulation. (Id.)

At Step 3, the ALJ determined that Waltz did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Id.) Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of Waltz's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could occasionally perform pushing and/or pulling motions with the lower extremities, such as operating pedals and foot controls. He could occasionally balance, stoop, crouch, use ramps and climb stairs. He could perform jobs that do no require kneeling, crawling, or climbing ladders, ropes or scaffolding. He could tolerate occasional exposure to vibration.

(Tr. 30).

In fashioning this RFC, the ALJ considered the medical evidence, the expert opinions, and Waltz's self-described limitations. (Tr. 30-33). The ALJ first engaged in a two-step process to evaluate Waltz's alleged symptoms, finding that, although the claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 31).

In making this determination, the ALJ considered Waltz's statements and testimony regarding his impairments and limitations, noting:

> The claimant alleges he is disabled and not able to work due to right knee degeneration, meniscus tear in right knee, plantar fasciitis/tarsal tunnel syndrome in left foot, right hip pain, Hashimoto's disease, and herpes in eyes. He stated that the pain wakes him several times a night. He noted that he must sit in a chair to get dressed. He reported that he is unable to stand for long periods to prepare meals. He stated that he could fold laundry while seated, and load and unload the dishwasher, but otherwise he is unable to do any other household chores or yard work. He noted that he does drive but prefers his wife to drive him because of severe pain in his lower extremities. He reported that he enjoys watching television and does it more often because he must sit or lie down and rest most of the day due to his injuries. He stated that he likes to have someone with him when he goes anywhere in cause his knees give out. He noted that he has difficulty with lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, and completing tasks. He reported that it is hard to walk at all, and the longer the distance, the more rest he needs. He stated that he has difficulty paying attention if he has a lot of pain. He noted that his pain increases with activity. He reported that he has pain all the time. He testified that he was prescribed a knee brace and a cane, but uses a wheelchair when things are bad. He stated that he could walk about half a city block, and cannot stand in one place due to pain. He noted that while sitting in recliner he needs to shift. He reported that he tries to help his wife with household chores but has to take breaks. He testified that he could drive for 30 minutes and then he is stiff (Exhibit 2E, 5E, 6E, Hearing Testimony). Overall, the claimant alleges he has been unable to sustain any type of work since the alleged onset date due to his impairments and alleged symptoms.

13

(Tr. 31). The ALJ concluded that the previously summarized longitudinal medical evidence of record did not support his allegations concerning the intensity, persistence, and limiting effects of his symptoms, stating:

> Physically he is obese and has some orthopedic issues with left foot and bilateral knees. Physical exam findings in both knees showed some tenderness along the medial joint line, crepitus at the patellofemoral articulation with active knee flexion and extension, negative for varus and valgus instability, no obvious effusion, he could perform straight leg raise, and he had no motor, sensory or reflex deficits (Exhibit 7F/p. 5). The undersigned finds that the record supports the claimant is limited to light exertion work as outlined above, to avoid any exacerbation of his symptoms.

(Tr. 32).

The ALJ also took into account Waltz's activities of daily living, noting that his level of activity, including his ability to manage his own personal care, prepare simple meals, load and unload the dishwasher, fold laundry, drive, shop, and enjoy watching TV and use his iPad, was not consistent with someone alleging such severe and debilitating symptomatology. (Tr. 32).

Finally, the ALJ considered the medical opinion evidence. The ALJ found the opinion of State agency medical consultant Dr. Manganiello partially persuasive to the extent that it limited Waltz to only occasional postural maneuvers, but never crawling or climbing ladders, ropes, or scaffolds, but concluded that the complete record, including his obesity and orthopedic issues, imaging and examination

14

findings, and Waltz's testimony, supported a further limitation to light work. (Tr. 32). The ALJ found the opinion of Dr. Walker persuasive as it was generally supported by and consistent with the medical evidence, including imaging and examination findings showing obesity and orthopedic issues, injections, and a knee brace, and Waltz's consistent complaints of pain, as well as Waltz's generally functional activities of daily living. (Tr. 32-33).

Conversely, the ALJ found the opinions of the examining physician, Dr. Chapla and Pivot Physical Therapy, not persuasive. As to Dr. Chapla's opinion, the ALJ stated that it was not consistent with or supported by the evidence, including his own examination findings showing good muscle strength, no cyanosis, clubbing or edema, normal gait and no focal neurological deficits. (Tr. 33). The ALJ also noted that Dr. Chapla issued his opinion more than a year and a half after the date last insured, that his limitations were unsupported and seemed exaggerated in light of the examination findings, and that his opinion was contradictory with regard to his need to use a cane. (Id.) As to the opinion issued by Pivot Physical Therapy, the ALJ noted it was unclear whether this opinion was from an acceptable medical source and further found it to be inconsistent with the longitudinal record which

15

reasonably supported that the claimant was limited to a reduced range of light exertion work. (Id.)[2]

Having made these findings, the ALJ concluded that Waltz could not perform any past relevant work, but that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Waltz could perform. (Tr. 34-35).

This appeal followed. (Doc. 1). On appeal, Waltz argues that the ALJ was mistaken as to his age and date last insured and that the ALJ erred in not assigning the opinions of Waltz's examining sources great weight. He also argues that the ALJ did not properly evaluate his Hashimoto's disease. However, finding that substantial evidence supported the ALJ's decision in this case, for the reasons set forth below, we will affirm the decision of the Commissioner.

## III.    **Discussion**

### A.    **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the

---

[2] The ALJ also considered an opinion from Dr. Nolan that Waltz had no restrictions in his activity but found it not persuasive. This opinion was issued after the date last insured, did not include a full functional analysis, and opined only regarding his abilities following his surgery on his foot. (Tr. 33).

findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; see, e.g., <u>Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also <u>Wright v.</u>

Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

19

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role

21

and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations

that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12,

2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his

decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C. **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application in January of 2021, following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency;

25

relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical

opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D.    The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Waltz retained the residual functional capacity to perform a range of light work with additional postural limitations. Therefore, we will affirm this decision.

### 1. *The Apparent Scrivener's Error Regarding Waltz's Age*

Waltz's main argument is that the ALJ was mistaken as to his age and his date

last insured. On this score, the plaintiff seizes onto the ALJ's statement that:

> The claimant was born on December 21, 1970, and was 50 years old,
> which is defined as a younger individual age 18-49, on the date last
> insured. The claimant subsequently changed age category to closely
> approaching advanced age (20 CFR 404.1563).

(Tr. 34). In fact, Waltz was forty-nine years old at alleged onset of his disability,

which is defined as a younger person under the Commissioner's regulations and

changed age category to closely approaching advanced age on his date last insured.

(Tr. 71). Clearly, the ALJ misstated the claimant's age category at the date last

insured, but, in our view, this is a mere scrivener's error that did not change the

ultimate outcome of the proceedings. As this Court has noted:

> "A scrivener's error is a transcription error or a typographical error."
> Hudon v. Astrue, Civil No. 10-cv-405-JL, 2011 WL 4382145, at *4
> (D.N.H. Sept. 20, 2011) (citing U.S. Nat'l Bank of Ore. v. Indep. Ins.
> Agents of Am., Inc., 508 U.S. 439, 462, 113 S. Ct. 2173, 124 L.Ed.2d
> 402 (1993)). Generally, a typographical or scrivener's error is harmless
> when the ALJ's meaning is clear in context. Calkins v. Sec'y of Health
> & Hum. Servs., No. 85-5685, 1986 WL 17083, at *2 (6th Cir. May 7,
> 1986) (unpublished) (holding that the district court properly "examined
> the opinion as a whole to interpret the true meaning of the ALJ's
> findings" and was not required to "ignore the real finding of the ALJ
> and instead blindly follow the transcriber's version of the finding.");
> Barnes v. Comm'r of Soc. Sec., No. 16-13714, 2018 WL 1474693, at
> *8 n.2 (E.D. Mich. Mar. 6, 2018) (finding that scrivener's errors were
> harmless because "the ALJ's true meaning is easily discernible for the

analysis on each topic"); <u>Duvall v. Comm'r of Soc. Sec.</u>, No. 2:19-cv-2346, 2020 WL 90750, at *2 (S.D. Ohio Jan. 8, 2020).

<u>Kane v. Kijakazi</u>, No. 1:22-CV-00582, 2023 WL 6119620, at *5–6 (M.D. Pa. Sept. 18, 2023). Indeed, courts have only been "reluctant to apply the scrivener's error doctrine when the apparent contradictions in an ALJ's decisions have the potential to materially affect the disability finding." <u>Neifert v. Kijakazi</u>, No. 1:21-CV-1780, 2022 WL 17627869 at *3 (M.D. Pa. Dec. 13, 2022).

Here, although the ALJ could have been more precise in his language, misstating that Waltz was a younger individual at the date last insured rather than on the date of the onset of his disability, he clearly acknowledged the most important aspects of his claim, that he was a younger individual at the inception of his claim, but subsequently changed age category to closely approaching advanced age. Moreover, the ALJ considered the correct age categories during the hearing and throughout the five-step analysis.[3] At the outset, the hearing transcript demonstrates that the ALJ questioned the vocational expert (VE) on Waltz's correct age, stating, "we have an individual currently age 52. At the amended onset date was 50. So,

---

[3] On this score, "[for purposes of applying the grids, there are three age categories: younger person (under age 50), person closely approaching advanced age (age 50-54), and person of advanced age (age 55 or older." <u>Lockwood v. Comm'r Social Sec. Admin.</u>, 616F. 3d 1068, 1071 (9th Cir. 2010) (citing C.F.R. § 404.1563(c)-(e)).

would be considered closely approaching advanced age." (Tr. 65). Further, at Step 5 of the sequential analysis in the ALJ's decision, the ALJ clearly considered Waltz's maximum abilities as a younger individual and an individual approaching advanced age, Rule 202.21 and Rule 202.14,[4] which both resulted in a finding of "not disabled." (Tr. 34-35). Accordingly, this apparent scrivener's error did not affect the ultimate outcome of the disability finding and was harmless. See Arnott v. Comm'r of Soc. Sec. Admin., No. CV-21-08205-PCT-DJH, 2023 WL 2734477, at *4 (D. Ariz. Mar. 31, 2023), aff'd sub nom. Arnott v. O'Malley, No. 23-15814, 2024 WL 2237720 (9th Cir. May 17, 2024) (finding harmless error where the ALJ mischaracterized the age categories applying to the plaintiff but clearly considered both correct age categories in referencing the appropriate Medical-Vocational Rules in her decision); Oscar K. v. Kijakazi, No. 320CV00673LABRBM, 2022 WL 141102, at *10 (S.D. Cal. Jan. 14, 2022) ("Because the ALJ's decision provided Plaintiff's correct date of birth and age category and relied upon the testimony of a Vocational Expert who also made opinions considering Plaintiff's correct age, the ALJ's error was harmless").

---

[4] See SSA, Program Operations Manual (POMS) DI 25025.035 Table No. 2, https://secure.ssa.gov/poms.nsf/lnx/0425025035 (June 2020).

2. ***The ALJ's Assessment of the Medical Opinion Evidence***

The plaintiff's remaining arguments are not thoroughly developed, but he raises a frequently disputed issue that the ALJ did not properly evaluate the medical source opinions of Waltz's treating physician, Dr. Chapla, and the examining opinion of Pivot Physical Therapy. The plaintiff essentially argues that it was error for the ALJ to credit the testimony of the non-examining physicians which conflicts with the opinions of an examining physicians. But, as previously noted, prior to the plaintiff's disability application in this case, the Commissioner decided to eschew this treating physician rule, which created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy, in favor of a more holistic approach which examines all medical opinions in terms of their overall consistency and supportability. Thus, our review of this case is cabined by the Social Security regulations' evolving standards regarding the evaluation of medical opinion evidence. After the paradigm shift in in the manner in which medical opinions are evaluated when assessing Social Security claims, "[t]he two 'most important factors for determining the persuasiveness of medical opinions are consistency and supportability,' [ ] [and] [a]n ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion." Andrew G. v. Comm'r of Soc. Sec. at *5 (citing 20 C.F.R. §§ 404.1520c (b)(2),

416.920c(b)(2)). But ultimately, provided that the decision is accompanied by an adequate, articulated rationale, examining these factors, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight. Moreover, in evaluating the persuasiveness of medical opinions the ALJ may discount an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the source's medical opinion, and the doctor's actual clinical observations, justifies deeming a medical source opinion unpersuasive. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005).

That is what took place here. In evaluating its persuasiveness, the ALJ noted that Dr. Chapla's highly restrictive opinion, including limiting him to only standing/walking for ten minutes and sitting for one hour, and stating he could not travel without a companion, walk a block on rough or uneven surfaces, use public transportation, or climb a few steps, was not consistent with or supported by the evidence, including his own examination findings. (Tr. 33). Indeed, as we previously noted, most of Waltz's appointments with Dr. Chapla during the relevant period were telehealth visits during which no physical examination was conducted and notes reflect he regularly denied chronic pain, loss of strength, and limb weakness.

33

(Tr. 489, 491, 494, 501). Moreover, the examination conducted a few months before Dr. Chapla issued his opinion, on March 4, 2022, showed good muscle strength, no cyanosis, clubbing or edema, normal gait, and no focal neurological deficits. (Tr. 482). The ALJ also found Dr. Chapla's opinion to be untimely, coming more than a year and a half after the plaintiff's date last insured, and internally inconsistent with regard to Waltz's use of a cane, stating on one hand that he did not require the use of a cane to ambulate, but then stating the use of a cane was medically necessary. (Tr. 33, 744).

The ALJ also appropriately considered the opinion of Pivot Physical therapy, finding it to be inconsistent with the longitudinal record, though persuasive to the extent it limited Waltz to occasional postural maneuvers but never crawl or climb ladders, ropes, or scaffolds. (Tr. 33). The ALJ also was unclear whether the opinion came from an acceptable medical source, since no name or title appears on the opinion. (Id.)[5]

Simply put, the plaintiff's bald assertion that, because these evaluations were conducted by treating physicians, they are entitled to great weight over the State

---

[5] We further note that this opinion was issued in November of 2022 some eighteen months after Waltz's date last insured, and it is somewhat difficult to reconcile the report's twenty five pound lifting and carrying findings with its conclusion that Waltz was confined to sedentary work.

agency physician is no longer the standard by which we assess the sufficiency of medical opinion analysis. Indeed, this analysis which found the opinion of Dr. Chapla to be unpersuasive, and the opinion of Pivot Physical Therapy only partially persuasive, drew support from significant and substantial evidence in the medical record, including Dr. Chapla's own examination notes. There was no error here.

### 3. The ALJ's Consideration of Waltz's Hashimoto's Disease

Finally, the plaintiff claims, without any legal or factual support, that the ALJ failed to properly evaluate his Hashimoto's Disease.[6] The ALJ found the plaintiff's hypothyroidism to be a non-severe impairment at Step 2. At Step 2 of the sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). An impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities. 20

---

[6] "Hashimoto's thyroiditis is 'a progressive type of autoimmune thyroiditis with lymphocytic infiltration of the gland and circulating antithyroid antibodies; patients have goiter and gradually develop hypothyroidism.'" Sells v. Sec'y of Health & Hum. Servs., No. 20-745V, 2025 WL 551602, at *4 (Fed. Cl. Jan. 24, 2025) (quoting Hashimoto's Disease, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=113684 (last visited Jan. 14, 2025)). Thus, we consider the ALJ's consideration and discussion of Waltz's hypothyroidism, the symptomatic chronic condition caused by Hashimoto's, to encompass his Hashimoto's diagnosis.

C.F.R. 404.1520(c). An impairment is severe if it is "something beyond 'a slight abnormality which would have no more than a minimal effect on an individual's ability to work.' " McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856 (1985)). If a claimant has *no* impairment or combination of impairments which significantly limits her physical or mental abilities to perform basic work activities, the claimant will be found "not disabled" and the evaluation process ends at step two, McCrea at 360 (emphasis added). If the claimant has *any* medically determinable impairment that is severe, the evaluation process continues. Id. Furthermore:

> [E]ven if an ALJ erroneously determines at step two that one impairment is not "severe," the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five. However, where it appears that the ALJ's error at step two also influenced the ALJ's RFC analysis, the reviewing court may remand the matter to the Commissioner for further consideration.

McClease v. Comm. of Soc. Sec., No. 8-CV-1673, 2009 WL 3497775, *10 (E.D. Pa. Oct. 28, 2009) (citing Nosse v. Astrue, No. 08–[CV–1173, 2009 WL 2986612, *10] (W.D. Pa. Sept. 17, 2009)). See also Salles v. Comm. of Soc. Sec., 229 F.Appx. 140, 145, n. 2 (3d Cir. 2007) (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005)) ("Because the ALJ found in Salles's favor at Step Two, even if he had

36

erroneously concluded that some of her impairments were non-severe, any error was harmless").

At the outset, we note that substantial evidence supported the ALJ's finding that Waltz's Hashimoto's disease was non-severe. The ALJ stated that Waltz's hypothyroidism did not cause any significant functional limitations and caused no more than a minimal effect on Waltz's ability to perform basic work related activities. Indeed, with the exception of one treatment note stating that Waltz's had stopped taking his levothyroxine two years prior and was feeling "terrible," (Tr. 499), the record reflects that once he started back on levothyroxine his condition improved and he reported that he was "slowly doing much better." (Tr. 493). No other issues are noted in the medical record with regard to his hypothyroidism or Hashimoto's disease, though it is noted that he continued with levothyroxine throughout the relevant period. (Tr. 380, 386, 400, 418). Moreover, Waltz's own disability application, function report, and testimony, beyond simply mentioning his Hashimoto's diagnosis, are devoid of any evidence that this condition caused any functional limitations, and the plaintiff points us to none.

Further, although the ALJ's discussion of Waltz's non-severe impairments is brief and cursory, the ALJ did state that, despite finding Waltz's hypothyroidism to be non-severe, he considered all the plaintiff's severe and non-severe impairments

when formulating the RFC. (Tr. 28). Indeed, in the RFC assessment, the ALJ acknowledged that Waltz alleged he was disabled by a combination of impairments, including Hashimoto's disease. (Tr. 31). Thus, any error at Step 2 would be harmless.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

## DI.    Conclusion

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

_s/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED: March 5, 2025